******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ESPINOSA, J., concurring. I agree with the majority that the judgment of conviction should be affirmed. I disagree, however, with the majority's conclusion in part I A 1 of its opinion and write separately because I believe that, although the prosecutor's reference to the defendant, Matthew O'Brien-Veader, during cross-examination as "a mean and nasty person who was looking to kill somebody" may appear improper at first blush, when placed in the context of the prosecutor's line of questioning, the statement was proper. I therefore concur in the judgment.

We generally recognize that "[a] prosecutor may not ask a question or make a comment during cross-examination that suggests that the defendant has a bad character or propensity for criminal behavior." *State* v. *Warholic*, 278 Conn. 354, 389–90, 897 A.2d 569 (2006). We also recognize, however, that when a prosecutor's potentially improper remarks are ambiguous, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning . . . ." *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 647, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974). The majority, by assuming that the only possible interpretation of the prosecutor's comment was that it suggested that the defendant had a bad character or propensity for criminal behavior, does not take into account the context of the comment and, as a result, overlooks its ambiguous nature.

Placed within its proper context, the prosecutor's description of the defendant as "mean and nasty" was not improper. The prosecutor's comment was a valid attempt to impeach the credibility of the defense's psychiatric expert, Seth Feuerstein, by calling into question his conclusion that the defendant had no history of violent behavior, despite being unaware of the defendant's violent episode several weeks prior to the murder. The prosecutor's line of questioning began when Feuerstein openly acknowledged that he does not "always have 100% of the information" when conducting analyses of patients. The prosecutor then asked Feuerstein whether his conclusion that the defendant was nonviolent would change if he knew that "just weeks before this homicide [the defendant's] friends had to take [a] knife away from him so that he didn't go and stab his girlfriend?" Feuerstein admitted that it was "not irrelevant" but still adhered to his conclusion that the defendant "has no history of violence." Feuerstein, however, then admitted that he "would have explored [the violent episode] in more detail." The prosecutor then responded with the challenged remark: "Sure. Because, I mean, maybe he's just a mean and nasty person who was looking to kill somebody." Fol-

lowing the defense's objection, the prosecutor more artfully rephrased his point: "Would you be interested in the fact that he was making threats to kill other people around the time that he killed [the victim] Joed Olivera? Wouldn't that inform your opinion about what was going through his head at the time of this particular murder?" The prosecutor's remark served to demonstrate both the incomplete nature of Feuerstein's psychiatric evaluation and to question whether there could be an alternative explanation for the defense's theory that the defendant's acts were an uncharacteristic extreme emotional reaction. Indeed, the majority acknowledges that the prosecutor's underlying point and line of questioning were "well supported . . . ."

The majority's disapproval of the statement stems from the prosecutor's use of the phrase "mean and nasty" to describe the defendant. It is worth observing that "mean and nasty" is an incredibly mild flavor of invective and not "gratuitous, crudely phrased, and inflammatory" such as those we have previously condemned. See *State* v. *Oehman*, 212 Conn. 325, 333, 562 A.2d 493 (1989) (prosecutor referred to defendant as " 'spoiled killer with a gun' " who had " 'no principles' "); *State* v. *Williams*, 204 Conn. 523, 546, 529 A.2d 653 (1987) (prosecutor called defendant, among other colorful epithets, " 'baby-beater,' " " 'infant-thrasher,' " " 'savage child beater,' " " 'evil man,' " and " 'drunken bum' "); *State* v. *Couture*, 194 Conn. 530, 561, 482 A.2d 300 (1984) (prosecutor denounced defendants as " 'murderous fiends,' " " 'rats,' " " 'utterly merciless killers,' " and " 'inhumane, unfeeling and reprehensible creatures' "), cert. denied, 409 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Oddly, the majority recognizes that the comment in the present case is "relatively tame" and falls far beneath the improper comments in these prior cases, but nonetheless determines that it is improper. See footnote 10 of the majority opinion.

In my view, the prosecutor's comment was not gratuitously pejorative, but rather an inartful and poorly crafted expression within a valid line of questioning. We have never required unerring eloquence or exacting linguistic precision from prosecutors while thinking on their feet during the rapid and often unpredictable exchange of cross-examination. Like closing arguments, cross-examination of a witness is "seldom carefully constructed in toto before the event [and] improvisation frequently results in syntax left imperfect and meaning less than crystal clear." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 368. Indeed, even had the prosecutor not used the exact words "mean and nasty" in phrasing his legitimate comment about the defendant's prior violent incident during which he threatened to harm his girlfriend with a knife, in order to rebut Feuerstein's conclusion of nonviolence, the prosecutor would have had to necessarily use *some* language to describe the defendant's violent

behavior during the incident. I therefore cannot agree with the majority's view that the prosecutor's otherwise entirely proper and on point comment is improper simply due to words he happened to employ while under the pressure of cross-examining a witness.

Furthermore, the majority's characterization of the prosecutor's comment as improper in the present case sanctions the practice by some defendants of recasting every blunder and misspoken word of a prosecutor over the course of a trial as "prosecutorial impropriety." It bears repeating that claims of prosecutorial impropriety are "not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 576, 849 A.2d 626 (2004). To brand every prosecutorial error with the weighty mark of "prosecutorial impropriety" will have the inevitable effect of making prosecutors unduly cautious and ultimately less effective in their advocacy on behalf of the state. Although "prosecutors are bound by constitutional constraints and the restraints of adversarial propriety, they are not shackled by the chains of inadequate advocacy." *State* v. *Coney*, 266 Conn. 787, 812 n.23, 835 A.2d 977 (2003). Zealous advocacy should not be supplanted by overcautious and ineffective advocacy.

Furthermore, lightly labeling minor prosecutorial missteps as improper also undermines the seriousness of claims brought by those defendants that have experienced egregious violations of their constitutional rights due to improper prosecutorial behavior. As this court has often observed, "[impropriety] is [impropriety], regardless of its ultimate effect on the fairness of a trial." *State* v. *Warholic*, supra, 278 Conn. 361–62. Thus, a prosecutor who asks a legitimate, but poorly phrased, question finds himself tossed upon the sea of impropriety alongside a prosecutor who impermissibly demeans a defendant for exercising his fifth or sixth amendment rights. The hypothetical defendants in each of those scenarios would find themselves sharing the same claim. A vast gulf separates the injuries to both defendants, yet both may claim an equally severe violation of their due process rights under the banner of prosecutorial impropriety. Certainly this serves to diminish the gravity with which an appellate court should evaluate severe prosecutorial improprieties and cheapens claims of seriously prejudicial due process violations.

I would not conclude that the prosecutor's "mean and nasty" comment was improper, and to do so will perpetuate a trend that unduly hampers prosecutors and undermines legitimate claims of prosecutorial impropriety. I therefore concur in the judgment.